GREEN P. COZART *et al.*, plaintiffs in error, *vs.* THE GEORGIA RAILROAD AND BANKING COMPANY, defendant in error.

A bill was filed by certain stockholders in a railroad company to enjoin it from the payment of interest on the bonds of another company which it indorsed, and also from purchasing or consummating the purchase already made of the road of the latter company, which was sold under a decree obtained by the former, on the ground that such acts were *ultra vires* and a fraud on complainants. There was no charge that the complainants were ignorant of the indorsements which had been acted on, and on which payments of interest had been made for nearly five years, nor that they were ignorant of such payment, except that they could not give the amount of the bonds, nor the length of time the interest had been paid. The answer states that the contract under which the indorsements were made, was duly put on the minutes of the directors; that there was no secresy in the matter, and all

the facts were generally known, and could have been ascertained by any stockholder on inquiry or examination of the books or minutes; that before the bonds were indorsed a report was made to a convention of stockholders setting out that it would be necessary to give guaranties and incur liabilities in behalf of such other company, and the object to be thereby attained was approved by resolution, and the president authorized to do all acts necessary to promote that object. The bill does not charge that complainants did not know of the sale and intended purchase; nor that they did not receive the notice sent them of such contemplated action; nor that they were ignorant of the suit instituted by their own company, in which the decree had been rendered. That suit was for the purpose of recovering the interest which the defendant company had paid, and to protect it against loss on account of its further liability on the indorsed bonds. The legislature had authorized the purchase, which had been made before the bill was presented, though not reported to and confirmed by the court directing the sale:

*Held*, that the chancellor did not abuse his discretion in refusing the injunction.

Injunction. Corporations. Stockholders. Railroads. Before Judge GIBSON. Richmond county. At Chambers. May 11, 1875.

Prior to April, 1870, the Central Railroad and Banking Company of this State, by an arrangement made with the Montgomery and West Point Railroad Company, now the Western Railroad Company of Alabama, whose eastern terminal points were West Point and Columbus, had secured advanges to itself, which the authorities of the Georgia Railroad and Banking Company believed were greatly injurious to their interests.

The president of the latter company, on the 29th of April, 1870, entered into a contract with the president of the Central Railroad Company, whereby the Georgia Railroad Company should share equally these advantages with the Central, by its jointly assuming certain liabilities into which the Central had entered in carrying out its plan with the Western Railroad Company. One of these was a joint indorsement of certain bonds of the latter company and the taking of one-half of the shares in it, of which the Central had become the owner, in the execution of said plan. This contract contained

Cozart *et al. vs.* The Georgia Railroad and Banking Company.

a condition that it was to be approved by the board of directors of the respective companies.

At a convention of the stockholders of the Georgia Railroad Company, held on the 11th day of May, 1870, a report was made by the directors, referring to the monopoly secured by the Central Railroad, and the exclusive benefits it would enjoy by its arrangements with the Western Railroad Company, and that there had been negotiations between the Georgia and Central companies to place each upon the same footing as to those advantages; that if the arrangement was effected, it was intended to make the Western Railroad a *first-class road* to Selma, Alabama, thereby adding greatly to its business capacity and attractions; that to do this, money would be required and responsibilities incurred; but it was believed that there would not be any risk of ultimate loss either by the *guaranties* or the *expenditures* to be made.

Resolutions were adopted at this meeting of the stockholders avowing the great importance of a business connection with the southwest, approving the views expressed in said report on that subject, and authorizing the president to do all acts necessary to promote that object on the basis stated in the report. A special resolution was also passed which declared that " it is expedient and wise in the president and directors of the Georgia Railroad and Banking Company, by every judicious and prudent means in their power, to extend and improve the connections of this road with the west."

On the 14th of June, 1870, the agreement of the 29th of April, between the presidents of the two companies, was ratified by the directors of the Georgia Railroad and Banking Company, having been previously ratified by the board of directors of the Central Railroad and Banking Company. During the year 1870, and the first of 1871, bonds of the Western Railroad Company were issued to the amount of $1,200,000 00, and were indorsed by the two Georgia companies. The Georgia Railroad and Banking Company has paid of the coupons of said bonds falling due to the time of the filing of this bill, the sum of $238,800 00. The an-

swer of the respondent states that there was no secrecy in any
of these transactions, and that they were on the minutes of
the directors and other books of the company, which were
accessible to any stockholder.  Subsequently, in the year
1873, the Western Railroad Company, being largely in-
debted to others, besides its liabilities to the companies, the
two latter, for their protection on their indorsements of said
bonds, and to secure other claims against said company,
caused proceedings to be instituted in the chancery court of
the second district of Alabama, in which a decree was ob-
tained in December, 1874, ordering the sale of the Western
Railroad, in the city of Montgomery, after an advertisement
of ninety days.  This sale was accordingly advertised for
ninety days, to be had on the 19th of April, 1875.  On the
23d of January, 1875, the directors of the Georgia Railroad
and Banking Company resolved to become a joint purchaser
with the Central Road of the said Western Railroad at the
approaching sale, and reported the basis on which the pro-
posed purchase should be made, which was adopted by the
Central.

A circular was sent, about the 18th or 20th of February,
1875, by the cashier of the Georgia Road, by the authority of
the directors, to the stockholders, giving a copy of the reso-
lutions adopted by the directors and the basis agreed on with
the Central, on which the purchase was proposed to be made.

An act of the legislature of this state was passed February
27th, 1875, authorizing the two Georgia companies to pur-
chase the Western Railroad at the approaching sale.  The re-
cord does not disclose that any stockholders made any objec-
tion to the intended action of the Georgia Railroad and
Banking Company as to the purchase, or any effort to
prevent the same, until the filing of this bill, two weeks
after the sale was had and the purchase effected.  The sale of
the Western Railroad was had on the 19th of April, 1875,
as advertised, and was purchased by the Central Railroad
and Banking Company and the Georgia Railroad and Bank-
ing Company, jointly.

Cozart *et al. vs.* The Georgia Railroad and Banking Company.

This bill was filed by complainants, who are stockholders in the latter company, to enjoin the company from the further payment of interest on any of the bonds indorsed by it in conjunction with the Central, and also to restrain it from purchasing or consummating said purchase. There is no charge in the bill that complainants or any stockholders were kept in ignorance of such indorsement thus acted on and on which payments had been made for nearly five years, or that they were ignorant of it, except that they could not accurately give the amounts of the bonds, and were unable to state how long the interest had been paid. Nor does the bill charge that complainants did not know of the sale and intended purchase; nor is there any denial, by affidavit or otherwise, that they did not receive the notice sent to them, nor do they set up that they were ignorant of the suit which their own company had instituted, under which the decree of sale had been obtained.

The injunction was refused, and complainants excepted.

R. Toombs; S. H. Hardeman, for plaintiffs in error.

W. H. Hull, for defendants.

Trippe, Judge.

The injunction prayed for was to restrain the defendant from further paying interest upon its indorsement of the bonds of the Western Railroad, and also from consummating the purchase which it and the Central Railroad and Banking Company had made of the Western Railroad. The chancellor, in refusing the injunction, put his decision on the ground that there was enough before him at the hearing to raise such a presumption of "ratification or consent of complainants, either actual or constructive," to the acts complained against, as to authorize him to refuse to interfere by injunction, and that the question whether they did so consent and ratify should be determined by a jury. We cannot say his discretion was abused. As to the matter of the liability of the de-

fendant corporation upon its indorsements, enough appears in the record, which, if sustained at the final hearing, would authorize an absolute decree against complainants refusing the injunction on the ground that the railroad company could not deny its liability, and that the stockholders were committed either by direct approval of the transaction or by having given such authority to the officers of the corporation, that they cannot now repudiate it. We are aware of the great conflict of authorities on the principle involved in this point. Some decisions go so far as to rule that any act of the officers of a corporation which is *ultra vires,* is void, and that no consent and acquiescence or ratification by the stockholders will make it valid, or estop them from asserting its illegality, whenever it may be their interest so to do. But there are more numerous cases to the contrary, and it is now generally accepted as the true rule that when the act is only *ultra vires* as between the corporators—because it is in violation of their rights—or when from some defect in a contract it may not be binding on the corporation, in all such cases both the corporation as an entity, and the stockholders, as such, may be estopped from repudiating it, either by express ratification or by such acquiescence and enjoyment of the fruits thereof as would make it a fraud to permit it to be set aside. Instances of both these kinds of *ultra vires* acts are generally governed by the rules applicable to principal and agent, or by an analagous principle adopted in reference to contracts under the statute of frauds, where, though the bargain or contract may not be binding, *ab initio,* it may still become so by the subsequent action of the parties to it: 1st Eng. R., 98; Law R., 7; C. P., 43; 23 Howard, 381; 4 Johns. Ch., 370; 43 *Georgia,* 13; 48 *Georgia,* 109; Brice's *Ultra Vires,* 462. There is, it is true, another class of *ultra vires* acts to which no ratification, even unanimously by the shareholders, nor any amount of performance or other thing done by the corporation can give life or legality. They are those by which the contract of the corporation with the public is violated—as where a new franchise is usurped—where the power is attempted to

be exercised by undertaking a new enterprise clearly outside of that authorized by the charter; for instance: where the legislature has authorized a railway to be constructed and worked, and the company undertakes to establish a bank or make an harbor. In such cases, nothing short of legislative assistance can give legal force to what may have been done. For were it not so, a charter for one purpose might be made an omnibus to carry any enterprise which avarice or selfish aggrandizement might suggest.

Now let us look to the facts of this case. The Georgia Railroad and Banking Company, jointly with the Central, indorsed certain bonds of the Western Railroad Company. This was done under a contract made between the two first. The Central, by some previous arrangement it had made with the Western, had gotten control of the latter, a monopoly of it, as it is called in the record. The Georgia Road, desiring to enjoy the benefits of its own connection with the Western Road, for the purpose of attaining this object and of sharing the advantages with the Central, agreed with the latter that they should jointly indorse these bonds; and this was a consideration for letting in the former to a joint participation of the benefits theretofore secured to the Central. Not only this, but by it the Western Road was induced to put itself within the control of these two. Under this arrangement the bonds were indorsed, put upon the market, were sold, and a large amount of money raised and expended in improving the Western Road, and in extending its connection, and thereby that of the Georgia with the Western. This was the avowed policy of the Georgia Road, so declared by its president and directors, and in a convention of the stockholders. The plan was fully carried out. The two companies, by the control obtained over the Western Railroad, reaped for about five years all the fruits of the general scheme, and paid, during that time, large amounts of interest to the holders of the indorsed bonds. All this tended to appreciate the bonds of the Western road so indorsed, and to induce their circulation and sale in the market, whilst the indorsers were enjoying the

power and benefits which they had thus purchased. Further, when the two indorsing companies ascertained that loss might finally be sustained by them, suit was instituted in their behalf against the Western Road, to be reimbursed for interest paid, and to secure them against further damage by reason of said indorsement. To this end a receiver was appointed, and afterwards, a final decree obtained ordering a sale of the road for which they had indorsed. Under this decree the sale was had, and whether the purchaser was a third person, or these two roads, does not affect the point now under consideration, to-wit: the liability of the Georgia Railroad and Banking Company upon a contract made as above stated, the fruits of which were thus used; upon which suit was brought, judgment rendered for it and its co-indorser, and actually the whole property of their principal, so to call the Western Road, sold by virtue of that judgment. Could the Georgia Railroad and Banking Company, under these facts, deny its liability upon said indorsement? If it could not, then no stockholder could not enjoin it from voluntarily paying what it could be forced by law to pay. Brice, in his work on the doctrine of *ultra vires,* page 380, in speaking of contracts which a corporation might deny, as not being bound by them, and how it might lose its right by way of being estopped, says: "Filing a bill to enforce the contract is sufficient, and so is the suing at law to judgment." Surely, if any case could authorize such a rule, a rule that under any circumstances would estop a corporation from denying the binding force of its contracts, it is the one at bar: See 47 Indiana, 407, 34 L. J., ch. 241; L. R., 6, ch. 551; and the opinion of BROWN, Chief Justice, in the *Central Railroad and Banking Company vs. Collins et al.,* 40 *Georgia,* 641. It might be sufficient to add, that if the holders of the indorsed bonds could enforce them against the railroad company, these complainants cannot restain the company from voluntarily discharging its liability; for it would be absurd to say the corporation was bound to pay, and at the same time admit that a stockholder, or any number of them, can prevent it. But

Cozart *et al. vs.* The Georgia Railroad and Banking Company.

the record shows many acts on the part of the stockhold-
ers from which their authority may be fairly, if not di-
rectly, inferred to have been given for the indorsement.    A
report was made to them in convention, stating the control
which had been gained by the Central Road over the Western,
the necessity for sharing this monopoly, the policy of extend-
ing the western connections of the Georgia Road, the pro-
priety and purpose of making the Western Railroad a first-
class road, and of building it to Selma, in the state of Ala-
bama, and that to accomplish this guarantees would have to
be given and liabilities incurred.    Resolutions were adopted
indorsing these views, and declaring that it was expedient and
wise for the president and directors, by every judicious and
prudent means in their power, to extend and improve the
connections of their road with the west, and that the presi-
dent be fully authorized to do all acts that may be necessary
to promote that object.    The answer to the bill states that
there was no secrecy in the matter; that all the facts were
generally known, and could have been ascertained by any
stockholder on inquiry or by examination of the books or
minutes; and that the contract with the Central Railroad was
entered on the minutes.    None of the complainants set up
that they were kept in ignorance, or were, in fact, ignorant,
of what was done, or of the making of the indorsement and
of the payments that had been going on for several years.
In the Phosphate of Lime Company *vs.* Green *et al.*, 1 Eng.
R., 98, it was held by all the judges—the opinions being
pronounced *seriatim*—that "to show assent and acquiescence,
it is not necessary to prove the acquiescence of each individual
stockholder.    It is enough to show circumstances which are
reasonably calculated to satisfy the court or a jury that the
thing to be ratified came to the knowledge of all who chose
to inquire, all having full opportunity and means of inquiry."
In the case of 43 *Georgia, supra,* there was a recognition of
a rule similar to the above, under a state of facts showing
that where knowledge of the act was at the command of all,
and there were circumstances that suggested an inquiry into

it brought to the notice of the stockholders, then knowledge would be presumed. Putting together all the foregoing facts, and more especially considering the suits by the company, the decree therein in its favor, and the sale under that decree, it may be said with emphasis that neither the corporation itself, nor a stockholder, or any number of them, can ask a court of equity to intervene on the ground of the want of charter-authority to make the indorsements.

Should the injunction be granted to restrain the Georgia Railroad Company from consummating the purchase of the Western Railroad ? A fact may properly be mentioned here that is not given in the reporter's statement: The decree under which the sale was had, in terms, recognized and recited the right of the Georgia Railroad and Banking Company, and the Central Railroad Company, or either of them, to buy the Western Railroad at the sale which was therein ordered. Subsequently, and about two months before the sale, the legislature of Georgia, by special act, empowered the two roads to make the purchase. The directors of each company resolved to do so, and notice was given to all the stockholders of the Georgia Railroad Company of that purpose. This notice was sent to each of the complainants two months prior to the purchase, and it was not denied that it was received. The purchase was made by the Georgia and Central Roads, jointly, under an agreement for that purpose. No dissent or objection was made by any one of the complainants or any other stockholder. With this direct assent on the part of the state, and this failure to make any objection on the part of any stockholder, after notice given, it would be a great wrong, if not a fraud, on the other co-purchasing company to cast upon it the whole burden of carrying out the purchase, which was prescribed in the decree, and at the same time would, in all probability, work much injury to other creditors of the Western Road, and other interests in that road, which were set up and provided for in the decree of sale. The state will not complain against the company for the usurpation of an ungranted power. It has consented to the exercise of this power for this very purpose.

The complaining stockholders, with express notice of the arrangement made with the Central for the purchase, and of the time when the sale would take place, failed to move until the deed was done; and then, when it would be almost impossible to tell what would be the result of restraining the Georgia Railroad Company from proceeding further in the matter, or the probable ruin that would thereby result to great and important interests of others, they ask for this injunction. It is asked for, both to restrain the company from making further payments on the indorsed bonds and from consummating said purchase. It is not prayed for in the alternative; that is, it is not asked that the purchase be restrained, independent of the injunction as to paying the bonds, and it is not presumable that such an injunction would be desired. For if the company is bound on the bonds, and the decree provides for its protection by a sale of the Western road, it is not probable that a stockholder should wish to deny it all the additional security that might be gained by getting absolute control of the property of its debtor, especially as the sale of the road of the insolvent company does not discharge its liabilities.

In view of all the facts, the refusal of the injunction by the chancellor is affirmed.