TAYLOR v. THE PHILADELPHIA & READING RAILROAD CO. and others.*

McCALMONT v. THE PHILADELPHIA & READING RAILROAD Co. and others.

(*Circuit Court, E. D. Pennsylvania.* April 21, 1881.)

1. CORPORATION—RAILROAD—ULTRA VIRES—POWER TO BORROW MONEY —ISSUE OF IRREDEEMABLE BONDS—OBLIGATIONS ENTITLING HOLDER TO SHARE ONLY IN PROFITS.

Under an authority to borrow money a railroad company has no right to raise money by the issue of irredeemable bonds entitling the holder merely to a share of the earnings after the payment of a certain dividend to the stockholders.

2. SAME—MORTGAGE TO SECURE PERPETUAL BONDS.

Nor has it the right to issue interest-bearing bonds, secured by mortgage, if a portion of such bonds are perpetual.

3. SAME.

A railroad company, after insolvency and appointment of receivers, adopted a plan by which, in order to pay the floating debt, income bonds were to be issued and sold entitling the holder to a certain dividend and share in the profits after payment of a dividend to stockholders; and, in order to retire and pay the mortgage debts of the company, bonds secured by a new mortgage for the whole amount of such debts were to be executed, some of which were to be payable in 50 years, and the others to be perpetual. *Held,* that in the absence of express legislative authority the issue of such obligations was beyond the power of the company, and would be restrained by injunction at the suit of stockholders.

*Reported by Frank P. Prichard, Esq., of the Philadelphia bar.

This was a hearing upon two motions,—one for a preliminary injunction on a bill filed by stockholders of a railroad to restrain the company, which was then in the hands of receivers, from issuing certain "deferred bonds" and from executing a certain mortgage upon its road; and the other for the rescission of an order made in the suit in which the receivers had been appointed, and authorizing the issue of the said "deferred bonds."    The facts appearing by the bill, petition, and affidavits were as follows:

The Philadelphia & Reading Railroad Company is a corporation chartered by the legislature of Pennsylvania.    Its charter gave it a general power to mortgage its property, and a supplement thereto provided as follows:

"That the president and managers of the Philadelphia & Reading Railroad Company may    *    *    *    secure such issues of bonds as they may deem advisable to make, bearing such rate of interest, with or without provision for the payment of taxes on the said bonds, and payable at such times as the president and managers may provide, either in United States money or sterling, by mortgaging, from time to time, the whole or any part of its railroads, real and personal estate, and corporate rights and franchises, acquired or to be acquired, and may dispose of the said bonds at such price and in such manner as they may determine; and any such mortgage may, at the option of the said president and directors, be made to secure bonds to be subsequently issued, as well as those issued prior to or contemporaneously with the date of the said instrument."

From time to time after its organization the company negotiated loans of money, to secure which it executed successive mortgages upon its road. It also accumulated a large floating debt.    In 1880 it became unable to meet its obligations, and on May 24, 1880, upon the suit of mortgage creditors, receivers of the corporation and of all its property, privileges, franchises, and powers, were appointed by the United States circuit court for the eastern district of Pennsylvania.    At the same time the court appointed two special masters in the cause.    On November 16, 1880, the railroad company and its receivers joined in a petition to the court, setting forth that the following proposition had been made by responsible parties for securing a contribution equal to $15 for each share of stock for the purpose of paying off the floating debt, viz.:

"The company is to issue 686,000 obligations of a par or nominal value of $50, to be known as deferred income bonds, on which interest only is to be payable, and that out of the annual surplus profits of the company remaining after the payment of a 6 per cent. dividend on the common stock.    These remaining surplus profits are to be first applied to the payment of a yearly interest, not exceeding 6 per cent. on the deferred income bonds, and after each class has had 6 per. cent., the deferred income bonds are to rank for further dividends *pari passu* with the common stock.    The right of the latter to this participation in the surplus profits of the company is to take effect as of December 1, 1880.

"The deferred income bonds are to be issued at 30 per cent. of their par value, or $15 per bond, payable in instalments, as follows:    Three dollars on subscription, four dollars one month thereafter, four dollars

three months thereafter, and four dollars five months thereafter, with the right to pay up in full at any time under 6 per cent. per annum discount. Scrip transferable to bearer will be issued if desired on the payment of the first instalment. Each stockholder is to have an option of taking a *pro rata* share of these obligations, and all not thus taken are to be awarded to an association or syndicate of the promoters of the plan, by whom its success is to be guarantied by the deposit of the sum of $2,058,-000. * * * * The company 'is to pay the guarantors a commission of 5 per cent. on the proceeds of the issue of deferred income bonds, and the net proceeds of the issue are to be applied to the payment of the floating debt."

The petition prayed that the court would approve of the issue of deferred income bonds of the character above stated, and that the money realized therefrom should be paid to the receivers and applied to the payment of the floating debt. This petition was accompanied by the report of one of the special masters, acting alone, in the necessary absence of the other, and approving the proposed scheme. On November 18, 1880, the court entered a decree granting the prayer of the petition, and authorizing and empowering the railroad company to issue the said bonds.

On December 7, 1880, the board of managers of the railroad company authorized the president to issue the said deferred income bonds. At the same time they approved and adopted a plan laid before them by the president to issue, in addition to the income bonds, a new consolidated 5 per cent. funding mortgage, to secure bonds to the amount of $150,000,000, which were to be used for retiring all the outstanding obligations of the company. These bonds were to be divided into two classes—A and B. Class A were to be either perpetual or 50-year obligations, with provision for renewal at the end of 50 years. They were to have priority over class B, and were to be used in retiring the earlier obligations of the company. The interest on them was to be cumulative, and subject to be collected by legal proceedings upon any default. Class B were to be perpetual obligations, and were to be used in retiring the later obligations of the company. The interest on them was to be cumulative, but no suit could be brought to recover such interest until three years after default. On the same day the receivers of the company approved this plan, and authorized the president of the company to carry it into effect. In pursuance of this authority, subscriptions were invited for the deferred income bonds, and were received from various parties. In the prospectus inviting these subscriptions it was stated that the plan was simply a method of obtaining a voluntary contribution from the shareholders, by offering them a reversionary interest in the earnings, and that the bonds would be irredeemable. Subsequently certain mortgage bondholders of the company, who were also stockholders, filed a petition for the revocation of the order of November 18, 1880, and also, as stockholders, filed a bill in equity, and moved for an injunction restraining the issue of the income bonds and the execution of the $150,000,000 mortgage. At a preliminary hearing, on February 14, 1881, upon these motions, the court modified the order of November 18, 1880, so that it should read as follows:

"And now, February, 14, 1881. this motion having been fully argued by counsel and duly considered by the court, it is now ordered that such part of the said order of November 18, 1880, as purports to confer authority by

this court upon the Philadelphia & Reading Railroad to adopt and carry into effect the deferred-bond plan, which is generally described in said order, be and the same is hereby revoked, and that the said order shall be construed and taken only as relieving said company from the effect of the injunction ordered by this court when receivers of the property of the said company were appointed, by permitting it to exercise, upon its own responsibility and according to its own legal discretion, such powers as its charter conferred upon it in providing means for the payment of its debts in the mode proposed."

The court then continued the hearing until March 25, 1881, and in the meanwhile restrained the respondents from doing any act by which the railroad company might be definitely bound with respect to the deferred-bond plan or the $150,000,000 mortgage loan. On March 25th a final hearing was had upon the two motions.

*Richard C. Dale, Ashbel Green,* and *John C. Bullitt,* for complainants.

*John G. Johnson* and *James E. Gowen,* for respondents.

*Richard C. McMurtrie,* for a subscriber to the deferred bonds.

McKennan, C. J. The present proceeding is two-fold: *First,* to obtain a rescission of an order made November 18, 1880, by one of the judges of this court at chambers, touching the issue by the Philadelphia & Reading Railroad Company of $34,000,000 of "deferred bonds;" and, *second,* to enjoin the issue of such bonds.

Whatever may be the literal import of the order of November 18, 1880, only the significance and effect of an order by consent can be given to it. The petition for it was referred to one of the masters in the cause. His report was favorable. All classes of interest supposed to be affected by it were apparently represented and concurring, and it was, therefore, made without argument and as of course. When it was afterwards challenged by the complainants here, the circumstances under which it was made were fully explained, and its phraseology was so changed as to exclude any inference of authoritative sanction of the plan referred to. The petition for the revocation of the order must then stand upon the same footing as to merit with the motion for the injunction.

The deferred-bond plan is challenged for the vital reason that the corporation is legally incompetent to institute it. It is notably peculiar in its features. It is a proposition by the corporation that the stock and bondholders shall subscribe

and pay ratably over $10,000,000, to be used in extinguishing the floating debt of the corporation; that to each subscriber shall be issued a writing, the form of which is yet undetermined, entitling him to receive 6 per cent. on the sum of $50 for each $15 paid by him out of the net earnings of the corporation, after paying all fixed charges and a dividend of 6 per cent. upon the common shares, and that for further interest these subscriptions will rank *pari passu* with the common shares. Is this proposition, then, authorized by the charter of the corporation?

The principle by which we must be guided in answering this question has been so often the subject of judicial recognition that it has grown into an axiom of construction. It is this: That the exercise of powers which are not conferred upon a corporation by express concession or clear implication must be taken as denied to it. It is thus comprehensively stated by Mr. Justice Miller, in *Thomas* v. *The West Jersey R. Co.* 101 U. S. 82:

" We take the general doctrine to be in this country, though there may be exceptional cases and some authorities to the contrary, that the powers of corporations organized under legislative statutes are such, and such only, as those statutes confer. Conceding the rule applicable to all statutes, that what is fairly implied is as much granted as what is expressed, it remains that the charter of a corporation is the measure of its powers, and that the enumeration of these powers implies the exclusion of all others." ·

Whatever power the defendant has in the premises can only be found in its general authority to borrow money. Neither in the charter of the defendant, nor in the special act which authorizes it to sell bonds, which it may issue below par, is anything contained to legalize the contested proposition, unless it can be put on the footing of a loan. Has it then this character? I think plainly not. It does not propose to create the relation of debtor and creditor between the defendant and the subscribers. The money obtained by the defendant could not be regarded as borrowed, because that implies re-imbursement, and it is not demandable by the subscribers or payable by the defendant. It has not the essential and distinguishing qualities of a loan. It contem-

plates a stipulation that the subscribers, in consideration of the sums paid—not lent—by them, shall be entitled to receive, in a remote and uncertain contingency, a portion of the defendant's earnings, to be measured by a certain rate per cent. upon three times the sums paid by them, and after that shall participate with the common shareholders in the division of the residuary earnings. By what allowable definition of a loan or borrowing such a transaction can be embraced I am at a loss to conceive. Nor will the fact that it is to be evidenced by the sealed writing of the defendant change its inherent character and bring it within the range of a power to which it is not otherwise referable.

In one respect, and in one only, does the plan proposed resemble a loan, and that is in the result to be attained. They are both expedients for raising money, but the method of accomplishing this result is of the essence of the power of the corporation. If its employment has not explicit legal sanction it cannot be made available. If the defendant were offered a rental for its property amply sufficient to relieve it from the burden of embarassment with which it is now struggling, unless it could show that its legislative creator had endowed it with a right to make a lease, it could not accept such relief. *Thomas* v. *West Jersey R. Co., ante.* And, although it has power to acquire real estate for all necessary corporate purposes, no one would maintain that it could lawfully enter into a contract for the purchase of real estate merely to resell and thereby realize large gains. Authority to raise money by borrowing does not imply the use of another and different method of raising it, however well adapted to the end it may be. Even in the prospectus issued by the president of the defendant (Exhibit 1) the proposed issue of "deferred bonds" is not in any aspect treated as a loan, and the system is correctly stated to be new in the United States, and to have been frequently adopted in Great Britain with great benefit to the companies and to subscribers. But we know that in Great Britain this "system" is expressly authorized by statute, and hence it may be assumed that such legislation was deemed necessary to legalize a resort to it. Is

not this suggestive of the inference that, although it has been proved to be of great benefit in Great Britain, it is "new" in this country, because it has been regarded as without necessary legislative authorization?

I am, therefore, of opinion that the issue of "deferred bonds," as proposed, is without warrant of law, and that the order of November 18, 1880, ought to be revoked and a preliminary injunction granted, and it is so ordered.

BUTLER, D. J., *concurring.* I propose to consider one only of the several aspects in which this case has been presented. Are the contemplated acts charged in the bill *ultra vires*— in other words, have the defendants lawful authority to do what is proposed by the "deferred-bond scheme?" As described in the president's "plan for financial re-organization," in the directors' and receivers' petition to the court, of November, 1880, and in the prospectus subsequently issued, and as illustrated by the sample before us of certificate or bond to be delivered to subscribers, it proposes an issue of $34,300,000 irredeemable income bonds of $50 each, at the price of $15 per bond, with interest at the rate of 6 per cent. on the face value, payable annually out of such surplus earnings as may remain after defraying expenses and affording dividends of 6 per cent. to the common stockholders, with a right to share equally with such stockholders any balance that may remain after 6 per cent. is thus paid. In the language of the president's London address, of December 23, 1880, it proposes to give—

"To every one who will pay $15 an obligation for the nominal value of $50, which is never to mature—with no liability on the company's part to pay the principal, and which shall entitle the holder, after the common shares have had a dividend of 6 per cent., to all that is earned up to 6 per cent., and thereafter to a further dividend *pari passu* with the common shares."

That the defendants have power to borrow money is not questioned, and could not be. The plaintiffs assert, however, that this is not a proposition to borrow money, but a scheme to sell stock. The defendants claim that it is strictly a proposition to borrow—conceding that, if it is not, but virtually

is to sell stock, they have no lawful authority to carry it out. Thus a vital issue of law is sharply defined and presented. It is one that neither requires nor admits of extended discussion. Every admissible definition of the term borrow or loan, as applied to money and commercial transactions, embraces an obligation to return the property borrowed. A loan of money is universally understood to be the delivery of a certain sum to another, on contract for its return, generally with interest, as compensation for its detention and use. To call the payment of money to another, who is to receive and permanently retain it as his own, in consideration for an annual benefit or profit, a *loan*, would seem to be a plain misuse of language.

There is no such thing known to commerce or transactions in money as an irredeemable loan in the sense here involved. Governments have issued obligations without provision or stipulation for repayment of the principal borrowed; but such obligations are redeemable at pleasure. Running, however, for an indefinite time, with no power in the holder to exact payment, they have come to be regarded as irredeemable, and an investment in them is, therefore, treated and described, not as a loan, but as the purchase of an annuity or stock. Aside, however, from the abstract considerations involved in defining the term *borrow* or *loan*, the corporate powers of the defendants to borrow money must be held to apply only to such methods of borrowing as fall within the ordinary sense of the term—as understood by the community, and illustrated in commercial transactions. Applying this test to the proposition here under consideration, it becomes plain that the transaction contemplated is not a *loan*. The certificate proposed to be issued would vest in the owner a joint interest with the common stockholder in the capital or property of the corporation, an interest purchased with his money, the earnings of which would be paid to him in dividends.

In every essential respect, therefore, he would be a stockholder. The circumstance that he could not vote for directors would not change the character of his interest, or the

nature of his relation to the company and its property. His situation would be similar to that of a silent partner in a commercial firm. The proposition, therefore, is for the sale of interests in the capital of the corporation—a sale of shares, shorn of the privilege of voting, with the right to dividends regulated by contract. It would seem that the defendants contemplated, in the beginning, a sale of stock in the usual form, calling the transaction by its proper name. Testimony taken by the master tends to show this. The absence of power to make such sale, and the apparent impossibility of borrowing money at the usual rates, and by the usual methods, and the obstacles interposed by usury laws, doubtless led to the change of plan, which, however, is little, if anything, more than a change in name.

The original thought and purpose have so far remained in the minds of the projectors, that the annual payments contemplated are still called "dividends," as appears by the "plan for re-organization," the directors' petition to court, the "prospectus," and the president's London address, while the scheme itself is described by them as an "issue of stock," and called such in the circular (known as Exhibit K,) wherein, it is said, this

"Issue of stock, with such prospects at $30 per $100, ought to produce a large bonus to such shareholders as may desire to sell their allotments, as its prospect of dividends is much better than those of many existing stocks standing at a higher price."

The English precedents which appear to have suggested this scheme, were, so far as we have been referred to them, all sales of stock in the usual form. In his London address the president said:

"This scheme is not a new one. Other companies in England have adopted this plan before. Within the last five or six years, according to a statement furnished me, the London, Brighton & Southeast Railway issued £1,500,000 worth of ordinary stock at 45 per cent. of its par value. The Grand Trunk Railway of Canada issued £7,500,000 of ordinary stock at £22 8s. I am told that the Manchester, Sheffield & Lincolnshire Company has issued £1,100,000 of ordinary stock at 50 per cent., and therefore we are not the first company to adopt a new scheme, which has been heralded by a good many people with a vast amount of ridicule."

Thus it appears by the statements of the president not

only that the English precedents were issues of ordinary stock, but also that he regards this scheme as precisely the same. The unfortunate distinction, however, between it and the precedents is, that they were authorized by statute, while it is not. The 26th and 27th Victoria, of July, 1863, known as "The Companies' Clauses Act," provides not only for the issue of ordinary stock or shares at less than the par value, by railway companies chartered in pursuance of, or conformity with it, but also for an increase of the capital by an issue of what is called debenture stock. That the defendants have no authority to issue stock for the purposes involved in the scheme under consideration, is not only clear on examination of the charter and subsequent statutes relating to the subject, but is fully conceded by their counsel. The proposed mortgage for $150,000,000 being liable to the same objection, as respects a part of the bonds proposed to be secured thereby, no further reference to it is necessary.

NOTE. As stated in the opinions in the foregoing case, such a plan as that proposed by the "deferred-bond" scheme is entirely new in this country. And I have been unable to find any English decisions that would shed much light on the particular question—an act of Parliament expressly authorizing such a scheme. But some of the " preferred-stock" cases in this country present strong points of analogy. The power of the corporation to create and issue such stock has been sought to be maintained as falling within the borrowing power of the corporation ; the plan, in fact, being used for the purpose of raising money. In the case of *Kent* v. *Quicksilver Min. Co.*, 78 N. Y. 159, the company being in need of funds, the stockholders adopted a by-law providing that stockholders who should surrender their certificates and pay five dollars on each share of stock should be entitled to the same number of shares of preferred stock, which should be entitled to 7 per cent. interest, to be paid out of the profits of the company, any surplus thereafter to be divided *pro rata* among common and preferred stockholders. The court held that it did not fall within the power to borrow money, and was *ultra vires*. *Folger*, *J.*, says: "It was not a borrowing. The idea of borrowing is not filled out unless there is in the agreement therefor a promise or understanding that what is borowed will be repaid or returned." Page 177. In these transactions, it is not by what name it is called, but what, in fact, the transaction is, that the courts consider. Thus, in Ohio, "*preferred stock-holders*" have been held to be creditors of the corporation, the transaction really being a borrowing of money, rather than the creation of an additional and preferred capital stock. *Burt* v. *Rattle*, 31 Ohio St. 116. But in that case the "stockholder" had not only not the right of voting,

but he was not interested in the earnings of the company beyond a certain fixed per centum, (the legal rate of interest in that state;) the principal was payable at a fixed time, and he was relieved of the liability to creditors prescribed by the constitution upon a stockholder.

## PRIVATE CORPORATIONS.

I. DEFINITION, SOURCE, AND EXTENT OF POWERS, ETC. An act of a corporation is described as being *ultra vires* when it is beyond the chartered powers of the corporation. A corporation derives all its power from its charter, and possesses only such powers as are thereby expressly or impliedly given. Many authorities hold that the charters of corporations are to be construed strictly against the corporation, and that consequently by implied powers are meant only such as are *necessarily* incident to those expressly granted. *Huntington* v. *Savings Bank,* 96 U. S. 388, 393: *Bradley* v. *N. Y., etc., R. Co.* 21 Conn. 306; *Pa. R. Co.* v. *Canal Com'rs,* 21 Pa. St. 22; Field, Corps. § 248. For a full discussion of the subject, see Potter on Corps. § 31 *et seq.* Where the charter fixes the amount of the capital stock and the number of shares, the amount cannot be increased or the number changed except in the manner expressly authorized by the charter, subsequent law accepted by the stockholders, or articles of association. *Railway Co.* v. *Allerton,* 18 Wall. 233; *N: Y., etc., R. Co.* v. *Schuyler,* 34 N. Y. 30; *Salem, etc., Corp.* v. *Ropes,* 6 Pick. 23; Green's Brice's Ultra Vir. (2d Ed.) 158, note *a.* *Contra, Belmont* v. *Erie R. Co.* 52 Barb. (N. Y.) 637; but see this case criticised, Jones, Rail. Secur. § 97. Nor can the character of the stock be changed, as by creating a preferred stock, without express authority therefor. *Kent* v. *Quicksilver Min. Co.* 78 N. Y. 159; Green's Brice's Ultra Vires, (2d Ed.) 164, and note *a.* Yet, if all the stockholders assented to such change, it will be supported in favor of one who has acted thereon in good faith. *Kent* v. *Quicksilver Min. Co., supra.* But, to accomplish the purposes of its creation, the corporation, by implication, has, to a large extent, the powers that an individual would have in the same position. *Thompson* v. *Lambert,* 44 Iowa, 239, 244; Field, Corp. § 271. For example, the power to borrow money, and give the usual obligations therefor, is an acknowledged incident of a private corporation. Field, Corp. §§ 249, 271; Green's Brice's Ultra Vires, (2d Ed.) 213. n. (a,) 223, note *a,* and cases cited.

II. ILLEGALITY Are contracts merely *ultra vires* illegal? The earlier English cases certainly so held. *East Anglian Ry. Co.* v. *Eastern Co.'s Ry. Co.* 11 C. B. 775; *McGregor* v. *Deal, etc., R. Co.* 18 Q. B. 618; see, also, Leake, Contracts, 582 *et seq.*; 5 Am. Law Rev. 272, 282, article by O. W. Holmes, Jr.; Green's Brice's Ultra Vires, (2d Ed.) 39 *et seq.* In the view taken by these decisions, corporate charters were encroachments upon public right, and it was public policy to keep them strictly within the limits prescribed by the organic law; the law impliedly prohibiting acts beyond them. Consequently every act exceeding such limits violated such public policy and implied prohibition, and was illegal and void. As to such contracts, there could be no ratification or estoppel. Id.; Leake, Contracts, 602. These views were at first accepted in this country, and the earlier cases rest on that basis. In an article in the Central Law

Journal for April 29, 1881, (12 Cent. L. J. 386,) I have attempted to show that the reasons for such a doctrine have passed away, and that the more recent cases have repudiated it. The great increase in their number, and the facility with which they are now organized under the general laws existing in most of the states, (taking the place of the former special act,) and many other matters that I have not space to mention, certainly indicate a most important change in the light in which corporations are viewed. And upon the weight of authority it is submitted that there is no implied prohibition of, nor is public policy violated by, corporate acts simply *ultra vires*, and, therefore, they are not illegal. *Union Nat. Bank* v. *Matthews*, 98 U. S. 621; *Oil Creek, etc., R. Co.* v. *Pa. Transp. Co.* 83 Pa. St. 160; *Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62; *State Bd. of Agric.* v. *Citizens St. R. Co.* 47 Ind. 407; *Hays* v. *Galion, etc., Co.* 29 Ohio St. 330, 340; *Darst* v. *Gale*, 83 Ill. 136; and cases cited in Green's Brice's Ultra Vires, 2d Ed. 720, note, *a*, and 12 Cent. L. J. 389, note 29; but see *Franklin Co.* v. *Lewiston Sav. Bank*, 68 Me. 43.; *Pa., etc, Co.* v. *Dandridge*, 8 Gill. & J. 248. Another question arises as to *quasi* public corporations, such as railroads, etc. They are invested with important public and governmental functions, and any attempt to use the power of eminent domain unauthorizedly, or any contract that would conflict with the duties that are imposed as the price of their extraordinary privileges, would violate public policy and be illegal and void. *Thomas* v. *R. Co.* 101 U. S. 71, 83, 84; *N. Y., etc., R. Co.* v. *Winans*, 17 How. 30; *Black* v. *Del., etc., Canal Co.* 22 N. J. Eq. 130; *A. & P. Tel. Co.* v. *U. P. R. Co.* 1 FED. REP. 745, 747, 752; *Bd. of Com'rs* v. *L., M. & B., etc., R. Co.* 50 Ind. 85, 108, 109; Pollock, Contracts, (Wald's Ed.) 95, 96; see *Mahoney* v. *Spring Valley, etc., Works*, 52 Cal. 159. Contracts *ultra vires*, which are positively prohibited either by the charter or the general law, or are against public policy, are illegal and void; and either party to the contract may make the defence. *Morris, etc., R. Co.* v. *Sussex R. Co.* 20 N. J. Eq. 542; *N. Y., etc., Ins. Co.* v. *Ely*, 2 Cow. 678; *Utica Ins. Co.* v. *Scott*, 19 John. 1; *Rutland, etc., R. Co.* v. *Proctor*, 29 Vt. 93, (*Redfield*, J.) But if the prohibition was intended simply as a rule for the government of the corporation, and the legislature did not intend to avoid the contract as against a party who has performed the contract, the plea of *ultra vires* cannot be made. *Union Bank* v. *Matthews*, 98 U. S. 621; *Lake Bank* v. *North*, 4 John. Ch. 370, (*Kent*, Ch.) Thus, one who has borrowed money from a national bank will not be permitted to defeat an action therefor, on the ground that the loan exceeded the sum it was permitted to lend. *Gold Min. Co.* v. *Nat. Bank*, 96 U. S. 640; *O'Hare* v. *Nat. Bank*, 77 Pa. St. 96. *Contra*, *Crocker* v. *Whitney*, 71 N. Y 161. Or that an insurance company had loaned money for a longer time than authorized. *Germantown, etc., Ins. Co.* v. *Dhein*, 43 Wis. 420.

III. EXECUTORY CONTRACTS. As to *ultra vires* contracts, which are wholly unexecuted, or those as to which the parties can be placed in *statu quo*, the plea of want of power is always available. The right of a stockholder, or, under certain circumstances, of a creditor, (as in the principal case,) to restrain the corporation or its officers from doing acts and entering into contracts *ultra vires*. is fully established. *Dodge* v. *Woolsey*, 18 How

331, 341-5; Field, Corp. §§ 264, 271, 273. The courts will not enforce purely executory *ultra vires* contracts, or award damages for their breach. *Screven Hose Co.* v. *Philpot*, 53 Ga. 625; *Thomas* v. *Railroad Co.* 101 U. S. 71; Field, Corp, § 264.

IV. APPARENT POWER. Where the question of authority depends, not merely upon the provision of law authorizing the contract, but also on extraneous facts, the corporation will be estopped to plead *ultra vires* as against a person without notice that the exercise was for a purpose, with an intent, or under circumstances unauthorized. *Miners' Ditch Co.* v. *Zellerbach*, 37 Cal. 543, 586-7, 595; Bigelow, Estoppel, 423; Potts, Corp. § 549; 2 Kent, 300, Holmes' note; *Ossipee etc.*, *Co.* v. *Canney*, 54 N. H. 295, 325-6. Thus, when a corporation has power under any circumstances to issue negotiable securities, the title of a *bona fide* holder of such paper is no more liable to be impeached than that of any other commercial paper. *Gelpcke* v. *City of Dubuque*, 1 Wall. 175; *Town of Coloma* v. *Eaves*, 92 U. S. 484; *Monument Nat. Bank* v. *Globe Works*, 101 Mass. 57; *Mad., etc., R. Co.* v. *Norwich*, 24 Ind. 457; Field, Corp. § 270; Jones, Rail. Secur. §§ 287, 295.

V. ESTOPPEL. As has been seen, a contract is not illegal simply because it exceeds the powers of the corporation. Is the corporation, then, absolutely. *incapable* of doing an act which transcends its powers? Theoretically, yes; practically, no. The well-settled liability for torts, and in cases of apparent power, is inconsistent with the idea that it is. See article on Ultra Vires by G. H. Wald, Esq., in 6 Cent. Law Jour. 2; *Selden*, J., in *Bissell* v. *Railway Cos.* 22 N. Y. 282-3. And it would seem to be established by the more recent decisions that, where a contract has in good faith been fully performed either by the corporation or the other party, the one who has received the benefit will not be permitted to resist the enforcement of the contract by the plea of mere want of power. *Oil Creek, etc., R. Co.* v. *Pa. Transp. Co.* 83 Pa. St. 160; *State Bd. of Agric.* v. *Citizens' St. Ry. Co.* 47 Ind. 407; *Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62; *Kent* v. *Quicksilver Min. Co.* 78 N. Y. 159; *Newburg Pet. Co.* v. *Weare*, 27 Ohio St. 343, 353-4; *Chester Glass Co.* v. *Dewey*, 16 Mass. 94, 102; *Gold Min. Co.* v. *Nat. Bank*, 96 U. S. 640; *Nat. Bank* v. *Matthews*, 98 U. S. 621; *Darst* v. *Gale*, 83 Ill. 136; *Lawrence*, C. J., in *Bradley* v. *Ballard*, 55 Ill. 417; *Cozart* v. *Ga. R. Co.* 54 Ga. 379; *A. & P. Tel. Co.* v. *Union, etc., Ry. Co.* 1 FED. REP. 745; Field, Corp. § 273; Sedgwick, Stat. & Const. Law, (1st Ed.) 90; and cases cited in Green's Brice's Ultra Vires, (2d Ed.) 729, note *a*; and 12 Cent. Law Jour. 389. *Contra*, older cases—*Hood* v. *N. Y., etc., R. Co.* 22 Conn. 502; [but see *Converse* v. *Norwich, etc., R. Co.* 33 Conn. 166, 180;] *Pa., etc., Co.* v. *Dandridge*, 8 Gill & J. 248; *Downing* v. *Mt. Wash., etc., Co.* 42 N. H. 230; *Bank of Chillicothe* v. *Swayne*, 8 Ohio, 527; [but see 29 Ohio St. 330; Id. 341; 27 Ohio. St. 343.] As to what will constitute assent and acquiescence on part of stockholders, see Jones, Rail. Secur. § 356; *Cozart* v. *Ga. Ry. Co.* 54 Ga. 379; *Kent* v. *Quicksilver Min. Co.* 78 N. Y. 159.

VI. TORTS. Corporations are liable for their torts in the same manner and to the same extent that individuals are liable under like circumstances. *Merchants' Nat.* v. *State Bank*, 10 Wall. 604; *Nat. Bank* v.

*Graham,* 100 U. S. 609 ; *Bissell* v. *Railway Cos.* 22 N. Y. 258 ; 40 N. Y. 158 ; 50 N Y. 396 ; Green's Brice's Ultra Vires, (1st Ed.) 263, note. And see, generally, upon the subject of Ultra Vires, 12 Cent. Law Jour. 386 *et seq.*

Cincinnati, *June,* 1881. J. C. HARPER.