THOMPSON ET AL. v. LAMBERT ET AL.

WEBER v. THE SCOTT COUNTY AGRICULTURAL SOCIETY ET AL.

1. Corporations: LEGISLATIVE AUTHORITY: CORPORATE PROPERTY. The legislature can in no manner control or interfere with the property of a private corporation.

2. ———: CORPORATE POWERS: MORTGAGE. For the purpose of carrying out the objects of the corporation its powers are as extensive as those of an individual, where they are not expressly limited, and it may borrow money and execute a mortgage upon the corporate property.

3. ———: MALFEASANCE. OF OFFICERS. The lender of the money is not affected by a misappropriation of the funds by the officers of the corporation, in the absence of any participation in the fraud, and such misappropriation constitutes no defense to an action for the recovery of the money, either at the instance of the corporation or a stockholder.

4. ———: ———: STOCKHOLDERS. If the stockholders, or any number of them, shall have been cognizant of such a misapplication of the funds borrowed by the corporation, and shall have participated in any advantages resulting therefrom, they will not be permitted to afterward set up such misapplication as a defense in an action by the lender against the corporation for his money.

5. ———: ———: ———. It is the duty of stockholders seeking relief from a misapplication of the corporate funds to take *immediate* steps to prevent it, and if with knowledge of the proposed illegal act they remain silent, they are bound thereby.

6. ———: ———: ULTRA VIRES. The doctrine of *ultra vires* will be applied to the contracts of corporations only when such contracts remain wholly executory.

*Appeal from Scott District Court.*

TUESDAY, OCTOBER 3.

THE plaintiffs in the first of the above actions are stockholders in the Scott County Agricultural Society, a corporation organized under chapter 44 of the Code of 1851, Rev., §. 1187, not for pecuniary profit, and brought their action against the defendants therein for the purpose of preventing said society from paying certain notes and a mortgage given to secure the same on the fair-grounds belonging to such society,

on the ground that the same were executed without authority and were not legal and valid obligations; pending which, John Weber brought the second action to foreclose the mortgage, and to obtain judgment for the amount due on the notes. His petition contained the usual and ordinary averments. Weber obtained the notes and mortgages by assignment from Mrs. Cook. In the last action, the plaintiffs in the first intervened and filed a cross-petition. The issues in both cases are substantially the same, and it was stipulated both causes should be heard and determined together, and that "all evidence taken in either case shall be read in evidence so far as material and competent, and shall be applicable to both cases."

The cross-petition is quite voluminous, and it is not deemed necessary to set it out in full; but the allegations thereof are sufficiently noticed in the opinion. The relief asked by the intervenors is that the notes and mortgages, as against the society, be declared null and void, and that the plaintiff, Weber, be enjoined from enforcing the same; but if a decree is rendered against the society, then it is asked that said society may be subrogated to the rights and interests of the plaintiff, Weber. The District Court rendered judgment for the amount due on the notes against the society, foreclosed the mortgage, dismissed the cross-petition, and the intervenors appeal.

*Bills & Block*, for appellants.

*Putnam & Rogers*, for appellees.

SEEVERS, CH. J.—At the annual fair of the Agricultural Society, in 1870, there occurred a violent storm which rendered egress therefrom difficult, and much inconvenience was experienced. Shortly thereafter, and on November 19th, 1870, there was held a meeting of the stockholders of the society, for the purpose of passing on certain proposed amendments to the articles of incorporation; all of the intervenors being present except Mr. Davenport. At the meeting the subject of organizing a corporation for pecuniary profit for

the purpose of constructing a street railway through the streets of the city of Davenport, to the grounds of the Agricultural Society, was broached, discussed, and generally acquiesced in, the object being to render ingress to and egress from the fair grounds more convenient. As a means to the desired end, it was suggested that the stockholders in the Agricultural Society should subscribe stock to the railway corporation to the amount of about ten thousand dollars, and the society should donate as much more, and with such funds the road should be built; it being contemplated that stockholders in the Agricultural Society only should take stock, and participate in the profits of the railway company. No vote for or against the proposition was taken and, without doubt, the intervenor, Thompson, objected thereto. This scheme, although attempted to be carried out, failed.

Afterward, on the 15th day of March, 1871, the board of directors of the Agricultural Society passed the following resolutions:

"WHEREAS, This society, on the 21st day of November, 1870, adopted a resolution authorizing the borrowing of twelve thousand dollars, and executing notes and mortgages for the same, under certain conditions; therefore, be it

" *Resolved*, That said resolutions authorizing the borrowing of said twelve thousand dollars be, and are hereby rescinded.

"*Resolved*, This society take stock in the Central R. R. of Davenport, to the amount of ten thousand dollars, and the President is hereby authorized to subscribe for the same.

" *Resolved*, That this society shall borrow of Mrs. Clarissa C. Cook the sum of ten thousand dollars, and that to secure the payment thereof, this society shall assign to her the six several notes of the Davenport Central Railway Company for ten thousand dollars, and the mortgage of said company to be executed to this society, and shall guarantee the payment of said notes; and that to further secure the guarantee of this Society upon said notes, there shall be executed the mortgage of the Society to Mrs. C. C. Cook, on its fair-ground property in Scott county, Iowa; and the form of said mortgage and

assignment and guarantee of said notes and mortgage of Davenport Central Railway Company, which are this day submitted to the Society, are approved, and the President and Secretary of this Society are hereby directed and authorized to execute for this Society the assignment and guarantee of said Central Railway notes and mortgage, and the mortgage from. this Society, and to affix the seal of this Society to said instrument.

"*Resolved,* This Society do and hereby authorize the President to borrow a sum of money sufficient to take up and pay the note and mortgage, now due and unpaid, against this Society, and the President and Secretary be and are hereby authorized to execute a note, or notes, and mortgage to secure the same."

The railway company had been previously organized substantially on the plan heretofore referred to, and executed the notes and mortgage referred to in the resolutions; and the notes were guaranteed, and a mortgage executed by the Agricultural Society as therein contemplated, and thereunder the money was obtained of Mrs. Cook, and $2,100 applied to the payment of a note and mortgage, given to the Savings Bank by the Agricultural Society, and the balance paid to the railway company, and with such funds and the amounts subscribed and paid by the stockholders in the railway company, the road was built and in operation about July 1st, 1871. For the purpose of obtaining funds to build the railway, a subscription paper was circulated among the stockholders of the Agricultural Society, which on its face showed that it was expected the society would donate ten thousand dollars to the railway company, and such paper was signed by all the intervenors except Thompson and Cressler.

It satisfactorily appears from the testimony that the two corporations, Mrs. Cook, and all persons consenting to the transactions above alluded to, understood the loan was to be made to the Agricultural Society, and that it was regarded as the principal debtor; it is true Mrs. Cook insisted she should also have a mortgage on the railway.

It also appears from the testimony that all these parties

acted in good faith, and with no design or intent to defraud any one. Nor do counsel for appellants in their argument insist on the allegations of fraud and bad faith made in the cross-petition, except in a single particular which will be hereafter noticed, but rest their case substantially, if not solely on the doctrine of *ultra vires*. Inasmuch as the Agricultural Society does not resist the payment of the notes and foreclosure of the mortgage, but on the contrary, insists that the whole transaction is fair, legitimate and proper, the question is as to the right of an individual stockholder to insist on the doctrine of *ultra vires*, and to what extent, if at all, his knowledge of and acquiescence in the illegal acts of the corporation will estop him from insisting thereon.

I. The objects of the Agricultural Society are public, and yet it is essentially a private corporation. The fact that it 1. CORPORA- was organized not for pecuniary profit does not TIONS:legisla- tive authori- change its character. The property mortgaged is ty: corporate property. the private property of the corporation. The manner which the public may use or enjoy this property is prescribed solely by the corporation, and upon its dissolution the stockholders are entitled to such property. The public authorities in no way or degree can control or derive any pecuniary benefit from the use of the property.

. The main distinction between public and private corporations, is that the general assembly has the "exclusive and unrestrained control" of the former, and can in no manner interfere with the right of property in the latter. Angell and Ames on Corporations, § 31.

II. The statute under which the Agricultural Society was incorporated, gave the corporators the right to assume any 2. ——: cor- and all powers necessary and proper to carry out porate pow- ers: mort- the objects of the corporation. They, however, gage. only declared the object of the corporation to be "the improvement of agriculture, horticulture, mechanic arts, rural and domestic economy," and assumed the power to hold an annual fair. The power to borrow money, execute notes and mortgages was neither assumed or prohibited.

In the absence of any such prohibitory provision the power

to borrow money, execute notes and mortgages, as evidences of and security for indebtedness created for the necessary and proper purpose of carrying out the objects of the corporation impliedly exists.

For the purpose of effecting the objects of the corporation its powers are as broad and comprehensive as those of an individual, unless the exercise of the asserted power is expressly prohibited. Code of 1851, § 708, 674; Rev. § 1187, 1151. *R. R. Co. v. Howard*, 7 Wall., 412; *Curtis v. Leavitt*, 15 N· Y., 9; Green's Brice's Ultra Vires, 115, 121; Angell and Ames on Corporations, § 110.

It therefore follows that the power existed to guarantee the notes and execute the mortgage, and borrow or obtain money if it was necessary to do so in order to effectuate the purposes of the corporation. If the money was applied to a proper corporation object, the intervenors cannot justly complain.

The question, therefore, is whether the misappropriation of the money (so borrowed) by the officers of the corporation, in 3. ——: malfeasance of officers. the absence of fraud, participated in by the lender, can be relied on as a defense by the corporation or an individual stockholder. The latter certainly has no greater or better right than the corporation, for the stockholder is only permitted to defend where the coporation fails or refuses to do so.

The lender may justly be required to examine the source of power, and ascertain whether the claimed or asserted power exists or not; but can he be required to follow the money and see that it is applied to a corporate purpose? To so require, it is said, would be " pressing the doctrine of *ultra vires* to an extent that can never be tolerated." *Bradley v. Bullard*, 55 Ill., 413.

And, when it is recollected that the power to borrow this money and execute the securities sued on existed, and that such power could be lawfully exercised, there is no legal or equitable principle, nor does sound morality require the lender to see to it that the money is applied to a proper and legitimate corporate purpose. To hold otherwise would greatly embarrass corporations, and render it impossible for them to

go into the money markets of the world and obtain money for the prosecution of their legitimate business. And, when it is remembered that much of the important business of the State is transacted by corporations, the result necessarily would be disastrous. The weight of authority in this country is in accord with this view. *Bradley v. Bullard, supra; State Board v. Citizens' Street Railway*, 47 Ind., 407; *Parish v. Wheeler*, 22 N. Y., 494; *DeGroff v. American Linen Thread Co.*, 21 Id., 124; *Moss v. Rossie Lead Co.*, 5 Hill, 137; Green's Brice's Ultra. Vires, 372, note.

It is urged that Mrs. Cook did not loan the money in good faith upon the security of the Agricultural Society, but that she refused to do so on the ground that the officers of the corporation had no right to divert its funds to the purchase of stock in a railroad. This is not a correct statement of Mrs. Cook's objection; but she refused to make the loan under the first proposition, on the ground that the money was to be *donated* to the railway company, and the proposition was then changed to the present form, and Mrs. Cook required as additional security, a mortgage on the property of the railway company. But, as we have said, there was no fraud intended by Mrs. Cook, nor are we able to see the slightest evidence of bad faith on her part. The fact that she knew the purpose to which the money was to be applied, and no fraudulent purpose on her part being shown, is entirely immaterial, as was expressly held in *Parish v. Wheeler* and *Bradley v. Bullard, supra.*

It is insisted that the plaintiff, Weber, is not a purchaser or holder of the notes and mortgages in good faith. Partly in support of this position, Mrs. Cook's answer is relied on; but we are unable to see how this becomes testimony against the plaintiff Weber. But, admitting that it is, all that is shown is that Judge Grant informed Mrs. Cook that he would find a purchaser, and that she sold the notes through Judge Grant to some unknown person. Mr. Weber is in possession of the notes, and there is no testimony showing that he is not a holder in good faith.

III. All the intervenors, except Thompson and Cressler,

were subscribers to the stock of the railway company; and the subscription paper contained a statement that the Agricultural Society would donate ten thousand dollars to the railway company. Such paper is not before us, but Mr. Haight testifies that such is his recollection of its contents; he is not positive, it is true, but this is entirely satisfactory when none of the intervenors have seen proper to contradict the testimony of Haight in this particular. All of the intervenors, and others who took stock in the railway company, did so on the faith and expectation of aid from the Agricultural Society, and had full knowledge of the proposed loan and execution of the notes and mortgages previous to the execution thereof.

*4. —: —: stockholders.*

The intervenors, who were stockholders in the railway company, having sold their stock in said corporation, and received all gains and profits that may have accrued to the railway company and its stockholders from the subscription to its stock by the Agricultural Society, cannot now, on the plainest principles of justice and equity, be heard to complain of the illegal act (if such it be), of which they had knowledge, and by which, it must be presumed, they were benefited, or at least which they at the time of the transaction must have supposed would benefit them.

It would be gross injustice to permit Mrs. Cook or the plaintiff Weber to be in the slightest degree prejudiced by parties occupying such equivocal position. Good faith required these parties to object before Mrs. Cook parted with her money, or forever hold their peace.

IV. Both Thompson and Cressler were present at the stockholders' meeting in November, 1870, when the subject of a donation to the railway was discussed and generally acquiesced in.

*5. —: —: —.*

Cressler's deposition was not taken, but Thompson testifies he never heard it proposed to make such *donation* until long after that meeting, and that he never consented thereto, but that he did hear some conversation at said meeting about taking stock to the amount of $10,000 he admits. The conversation he states was of a desultory character; "that if each

stockholder in the Agricultural Society would subscribe $250 or may be only $200, he would get a paid up share in the railway company for every $50 paid." This in substance was the plan afterward adopted. Mr. Thompson also states that different persons' during the spring of 1871, spoke to him about taking stock (in the railway company it is presumed) and he refused.

Judge Grant testifies that between November, 1870 and March 1871, (which was before the loan was effected), he talked with Mr. Thompson in relation to taking stock in the railway company, and that he then knew it was proposed to have the Agricultural Society make a donation to the railway company. The report of the treasurer of the Agricultural Society for 1871 shows that upward of $10,000 had been obtained of Mrs. Cook on mortgage, and the dispositon thereof. The railway was built and in operation at the time of the fair in 1871.

Under these circumstances we are of the opinion that Thompson and Cressler had sufficient knowledge to put them on an inquiry. They knew it was proposed in some way to have the Agricultural Society aid in building the railway, and inquiry prosecuted with diligence and a fair degree of earnestness to obtain information, would have developed the fact as to the proposal to guarantee the notes and execute the mortgage. There is nothing tending to show there was any secrecy intended, nor was the proposition in any manner concealed. But knowing the matter was talked about and canvassed, Thompson and Cressler did nothing to prevent the consummation of the claimed illegal act, and to which they were opposed, until the commencement of this action in December, 1872. They had sufficient knowledge of what was proposed to be done to warrant them in applying for an injunction as early as March, 1871, and had they done so before the loan was effected, their standing and the question for determination would have been very different.

The stockholder of a corporation who seeks to prevent the consummation of an illegal corporate act, or to avoid it, should be *swift* to make known his desires and assert his rights

through the tribunals appointed for that purpose. The late case of Watts' Appeal, 78 Penn. St., 370, is much like the case at bar.

In the spring of 1871, Mrs. Cook parted with her money in good faith. On her part the transaction was then wholly 6. ——: ——: executed and nothing more remained to be done. ultra vires. The only way she, or her assignee can be made whole is the re-payment of the money. As we understand the rule *ultra vires* prevails in full force only where the contracts of corporations of this character remain wholly executory. *Bradley v. Bullard, supra,* and other authorities cited. This rule prevails even as to public or municipal corporations in analogous cases. *Trask v. Adams,* 10 Cush., 252; *Fuller v. Melrose,* 1 Allen, 166; *Allegheny v. McCluskan,* 14 Penn. St., 81; Cooley on Taxation, 573, and the same rule has been recognized by this court in *B. C. R. & M. R. R. Co. v. Stewart,* 39 Iowa, 267.

V. No authority is cited by counsel in support of the claim that the Agricultural Society be subrogated to the rights of the plaintiff, Weber, as against the railway company. The Agricultural Society asks no such relief and makes no such claim, and we are of the opinion under the facts in this case, the only relief the intervenors as stockholders can have, is in the nature of preventive remedies. That is to say, an illegal act may be prevented or avoided at the suit of a stockholder, but he can have no other or greater relief. The judgment of the District Court is

AFFIRMED.