# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed July 28, 1905.

NATIONAL MECHANICS BANK
VS.
MARYLAND TRUST COMPANY.

*Barton. Wilmer. Ambler & Stewart* for the Bank.

*Marbury & Gosnell* for the Trust Company.

*John F. Williams* and *Taylor & Keech* for other exceptants.

BAER, J.—

The Maryland Trust Company and the Guardian Trust Company were corporations of the State of Maryland doing business in Baltimore city. Sometime in February, or in the early part of March, 1901, in a conversation between John B. Ramsay and J. Bernard Scott, Secretary and Treasurer of the Maryland Company, the suggestion was made, whether by Ramsay or Scott does not clearly appear, that "it would be a good thing for the Maryland Com-

pany to absorb the Guardian Company." Subsequently, by the direction of J. Wilcox Brown, the President of the Maryland Company, Mr. Scott and Mr. Henry J. Bowdoin, the Vice-President of the Maryland Company, called upon Mr. Ramsay, to see "if we could not get down to a basis upon which to open a negotiation, Mr. Ramsay being, as we considered, a desirable channel, through which to make the transaction." Finally it was agreed that Ramsay, acting as the agent of the Maryland Trust Company, should undertake to secure a controlling interest in the capital stock of the Guardian Company (sixty per cent. being the amount fixed) upon the basis of one share of the Maryland Company for two shares of the Guardian. While, apparently negotiations for the merger were in progress before March 19, 1901, between Ramsay and the Executive Committee of the Guardian Company, the formal offer on the part of Ramsay was made to the Guardian Company on that day.

In this offer (Claimant's Exhibit J. B. R., No. 9) Ramsay said: "I propose to effect a consolidation of the Maryland Trust Company and the Guardian Trust Company, upon the basis of exchanging two shares of the Guardian Trust and Deposit Company for one share of the Maryland Trust Company."

"The Maryland Trust Company has officially assented to this plan, and I believe the company represented by you should do so at once. Please let me hear from you as soon as possible."

This communication was addressed to the Executive Committee of the Guardian Company.

A special meeting of the Board of Directors of the Guardian Company was held on the next day, March 20, 1901, to consider this offer, and a resolution was adopted by a vote of 20 to 1, that "the Board of Directors approve the offer of the Maryland Trust Company, and recommend, to the stockholders of the Guardian Trust and Deposit Company, the acceptance of the proposition of the Maryland Trust Company." It was also resolved that "the sub-committee, as selected by the executive committee, viz., Messrs. Jonathan K. Taylor, George R. McGaw, together with the president, be continued to consummate the union of the Guar-

dian Trust and Deposit Company with the Maryland Trust Company."

The president of the Guardian, at this meeting, stated that "the exchange was unanimously favored by the executive committee of the Guardian Trust and Deposit Company, and that the conclusion had only been reached after a full examination of the assets of the Maryland Trust Company." (J. B. R., No. 9.)

At the time of the interview between Mr. Ramsay and Mr. Bowdoin and Mr. Scott, when it was finally determined that the effort should be made to acquire a controlling interest in the Guardian Company, Mr. Ramsay stated that, if he succeeded in accomplishing the desired result, he would expect to be paid for his services. When asked what amount he would expect to receive, he replied, "$100,000."

The amount of this fee was not objected to by Mr. Bowdoin or Mr. Scott, and it was afterwards paid. This fee was characterized at the hearing as exorbitant. Whether it was or not is not a question in the matter now before the court. The officers of the Trust Company apparently did not think so, as it was acquiesced in by them without dispute, and Mr. Ramsay seemed to think that it was scarcely sufficient as he sent a bill to the Guardian Company after the merger had been consummated for $25,000 which, however, was not paid.

On March 21, 1901, the day following the meeting of the Board of Directors of the Guardian Company, an option agreement was entered into between Ramsay and the committee of the Guardian Company, by which Ramsay agreed to purchase sixty per cent. of the stock of the Guardian Company, and to pay for the same with one share of the Maryland Company for two shares of the Guardian Company, on or before June 1, 1901.

With this initial transaction, the Mechanics' Bank, of which Ramsay was the president, had nothing whatever to do. He was acting in his individual capacity and as the agent of the Maryland Trust Company.

On March 26, 1901, Ramsay was officially notified that the owners of 7897 shares (more than sixty per cent.), of the Guardian Company had signed the option agreement, and Ramsay agreed to take the stock, the de-

liveries in Maryland stock to be on or before June 15, 1901.

At first Mr. Ramsay testified that the transaction, out of which this controversy arises, did not take place until after March 26, 1901, when he had secured more than sixty per cent. of the stock in the Guardian Company. Afterwards he qualified his statement in this regard, and it is clear, from the testimony and exhibits, that some of the purchases of the stock of the Maryland Company by Ramsay were made before March 26, 1901.

Altogether, beginning apparently on March 22, 1901, 1311 shares of the stock of the Maryland Trust Company were purchased by Ramsay mainly in the months of March, April and May in the year 1901, the last purchase being about January, 1902, from Hutzler. All of these purchases were paid for with the money of the Mechanics' Bank, and it is for the amount thus paid that the Bank claims to be a creditor of the Maryland Trust Company, and asks to have its claim allowed out of the assets of the Trust Company in the hands of the receiver in this case. It is to this claim that exceptions are filed, first, by other creditors of the Trust Company, secondly, by certain stockholders of the company, and thirdly, by the Maryland Trust Company itself. It is necessary, therefore, to ascertain the facts in regard to these purchases, and then to apply the law to the facts thus ascertained.

It is clear from the testimony that the agreement for the merger of the two trust companies, upon the basis of two shares of the Guardian for one of the Maryland was based, not upon the market price of the stocks of the companies, respectively, but upon a comparison of their assets, as shown by their books, the statement of the Maryland Company showing a book value of about $250 per share, and that of the Guardian Company a value of about $125 per share.

It further appears that, when it became known that the merger of the two Companies was contemplated, Hambleton & Company, bankers and stockholders in Baltimore city, began an effort to induct the stockholders of the Guardian Company to refuse the offer of the Maryland Trust Company, and to accept from them a cash offer of $110 per share for the Guardian

stock. About this fact there is no dispute.

An apprehension, whether well founded or not, appears to have existed in the minds of the officers of the Maryland Trust Company that Hambleton & Company would make what is termed "a raid" upon the stock of the Maryland Company, that is, would offer it for sale in such amounts that its market price would be depressed, and that this depression would cause the stockholders of the Guardian Company to decline to accept Ramsay's offer for one for two, and to accept Hambleton & Company's cash offer of $110 per share.

It was this apprehension that led to the purchases by Ramsay of the 1,311 shares of stock of the Maryland Company. The three witnesses who testify to the circumstances, under which it was agreed that Ramsay should make these purchases, are Ramsay, himself, Mr. Henry J. Bowdoin, Vice-President of the Maryland Company, and Mr. J. Bernard Scott, its Secretary and Treasurer. They give substantially similar accounts of the transaction.

Without referring specifically to their testimony, it is sufficient to say that Mr. Bowdoin and Mr. Scott, purporting to act for the Maryland Trust Company, authorized Mr. Ramsay to make purchases of the stock of the company on behalf of the company, and Mr. Ramsay agreed, as President of the Mechanics' Bank, that the bank should furnish the money with which to make these purchases, holding the stock, then purchased, as collateral security for the advances. The object of making these purchases was undoubtedly to keep the market price of the stock from being depressed to a point that would make it seem undesirable to the stockholders of the Guardian Company to accept the terms of merger.

Mr. Scott says that "the chief obstacle in the way of the consumation of the deal seemed to be the fact that the Maryland Trust Company's stock had been depressed in the market, and sold at a price which did not represent twice the market value of the stock of the Guardian Trust Company, and the officers of the Maryland Trust Company were authorized to buy stock of the Maryland Trust Company in the market in order to overcome that condition."

Mr. Bowdoin says that the stock was purchased "because the parity which it was necessary to maintain between the outstanding stock of the Guardian Trust Company and the stock of the Maryland Trust Company had been interfered with."

As has been stated, there is no dispute that it was the money of the Mechanics' Bank, which paid for the 1311 shares of stock that were purchased.

The next inquiry is as to the form which this transaction with the Mechanics' Bank took. About this there does not seem to be any serious difficulty from the testimony. Ramsay stated to Scott and Bowdoin that, as the transaction would involve a loan of more than $100,000, which sum was one-tenth of the capital stock of the Bank, it would be a violation of the National Banking Law to make the loan directly to the Trust Company, but that this difficulty could be overcome by dividing the amount loaned into sums less than $100,000, taking obligations of employees of the Trust Company for the divided amounts, and having the Trust Company give a guaranty of the payment of these obligations. And this is the form which the transaction finally took.

Without going into the details, as they appear in the testimony, it is sufficient to say that Ramsay purchased, from time to time, stock of the Trust Company, which was paid for out of the funds of the Bank, the aggregate amount without interest being $281,447.73, and that for this sum, in varying amounts, the Bank holds the demand notes of three of the employees of the Trust Company.

The guaranties given by the Trust Company are all substantially in the same form, under the seal of the company, and signed either by the president or vice-president of the company. The guaranty provides that the Maryland Trust Company doth "hereby guarantee to the said National Mechanics' Bank of Maryland, agree to pay to it on demand, at any time after maturity, any and all loans and discounts that may have been made, or may be made by it to J. Bernard Scott, agent, and also any indebtedness of the said J. Bernard Scott, agent, to said Bank now existing, or that may hereafter exist, whether the same be extended or renewed or not, provided, however, that it shall not be required to pay under this guarantee a greater sum than $95,243.88, and provided further, that this guarantee shall only extend to loans and discounts made by the said Bank to J. Bernard Scott, agent, and it does hereby waive all notices of the acceptance of this guarantee."

It was earnestly contended by the counsel for the Trust Company that, upon all the facts of the case, the agreement between the Bank and the Trust Company was that "the Bank was to become a stockholder in the Trust Company by purchasing large amounts of its stock, with the understanding and agreement on the part of the Trust Company that it would repurchase the same from the bank by paying the notes of Van Ness and others."

I cannot find from the testimony that such was the contract between the Bank and the Trust Company. It seems to me clear from the evidence that, in the purchase of this stock, Ramsay was acting as the agent of Maryland Trust Company, and that the agreement on the part of the bank was to loan the money with which to pay for the purchases. It is true that the stock was never transferred to the Trust Company but stood in the name of the broker, through whom the purchases were made.

The certificates were endorsed in blank by the broker, and delivered to Ramsay, who in receiving them, was acting as the agent of the Trust Company, and it was deposited by him with the Bank, as collateral security for the payment of the loan made by the Bank in advancing the money with which the stock was purchased.

Assuming the facts to be as just stated there is presented a case of a bank loaning money to a trust company, the trust company applying the money to the purchase of shares of its own stock and pledging the stock so purchased to the bank as collateral security for the payment of the loan. The transaction took the peculiar form of notes given by employees of the Trust Company with its guarantee for the reason already indicated. The Bank is seeking payment of the loan made out of the assets of the Trust Company, and this payment is resisted by creditors and stockholders on grounds which will now be considered.

In the first place, it may be said, that the objections of other creditors of the Trust Company are put out of the way, by the agreement of the bank that the payment of its claim shall be postponed to that of all other creditors. Exceptions having been filed by individual stockholders, and also by the Trust Company itself, but as it represents only creditors and stockholders, and creditors are out of the way, the controversy is wholly one between the Bank and the stockholders of the Trust Company.

First. It is contended that the Bank must stand or fall by the obligation, that is the guarantee of the Trust Company, which it holds, and that its claim on the guarantee cannot be allowed, because, in point of fact, no "loans or discounts" were ever made by the Bank to the employees of the Trust Company whose demand notes the Bank holds, that Mr. Ramsay testified that none of these employees "owed the Bank one dollar," that no demand is proven to have been made upon the makers of these notes, and that the guarantees are not binding upon the Trust Company because the officers of that company, who undertook to execute them in behalf of the company, were not authorized so to do by the vote of six out of seven members of the executive committee of the company, as required by a by-law of the company.

But, if, in a court of equity the Bank can be allowed to go behind the mere form of the transaction and show that, while the obligation of the Trust Company, in form was that of a guarantee, in reality the Trust Company was the principal, that it really borrowed the money and applied the money to its own purposes, it becomes unnecessary to consider the objections mentioned, if the claim stood upon the guarantee alone. In the consideration of this point the other grounds of exception must be laid aside. There is no question of *ultra vires* or illegal purposes.

The Trust Company certainly had the power to borrow and the Bank to lend money. If the fact is, as has been already found, that the Bank actually loaned the money to the Trust Company, did not credit the makers of the notes, the employees of the company, and never intended to look to them for the payment of the loan, can there be any question that, in a

court of equity at least, the transaction, whatever form it may have assumed, will be regarded as an original undertaking on the part of the Trust Company.

To hold otherwise, would be to allow the Trust Company to say, "it is true the company borrowed the money; it went into the company's treasury; and the company now has it, but the obligation which the company gave for it was a guarantee, and the Bank cannot recover, because, in point of fact, no loan was ever made to the makers of the note, but to the company, or because no demand has been made upon the makers, or because the guarantee was not properly given in accordance with the by-laws of the company."

Citations of authorities would seem to be unnecessary to show that the Trust Company cannot be permitted to assume such an attitude. In Maryland, even at law, it is said that "whenever the main purpose and object of a promissor is not to answer for another, but to subserve some purpose of his own, the promise is not within the statute, although it may be in the form of a promise to pay the debt of another." Small vs. Shaefer, 24 Md. 144.

So in Myer vs. Grafflin, 31 Md. 350, although the language used by the defendant, "I will see it paid," ordinarily implies a collateral undertaking, "if accompanied by other words or facts sufficient to authorize a jury to find from all the evidence that credit was given to the party using them, and the jury so find, he will be held responsible. In this case the guarantee "I will see it paid," was oral, but if it had been paid in writing would not "the accompanying words and facts" have been admitted in evidence to show that "credit was given to the party using them," not for the purpose of varying or altering the terms of the written obligation, but to show from all the facts and circumstances what that obligation really was.

In that case the goods sold were actually delivered not to the promissor but to the third party. This case is much stronger, because it must be assumed, as has been said, upon this branch of the case, that the money was actually loaned to and received by the Trust Company, which executed the guaranty.

It is said, however, that there is a special reason in this case why the

Bank should not be permitted to show that while in form a guaranty, the transaction was really a loan of money to the Bank. This reason is thus stated in the brief filed on behalf of the Trust Company:

"Because the Bank is estopped from proving, as part of its case, and as the ground upon which it seeks the aid of a court of equity, that it made a contract in direct violation of the provisions of its own charter and of the laws of the United States."

It must still be borne in mind that the other grounds of exception do not enter into the consideration of this question. The National Banking Act says (Revised Statutes, Sec. 5200), "The total liabilities to any association of any person, company, corporation or firm, for money borrowed, including in the liability of a firm the liabilities of the several members thereof, shall at no time exceed one-tenth part of the amount of the capital stock of such association actually paid in."

The Trust Company applies to the Bank for a loan in excess of one-tenth of the capital stock of the Bank, and is told that, by reason of this provision of the National Banking Law, a loan to the amount desired cannot be made directly to the Trust Company, but the Bank suggests that this provision of the law may be avoided or evaded, or overcome, by letting the transaction take the form which it did, and which it is not necessary again to particularize. This form is adopted, and the money is actually loaned to the Trust Company. The Bank is now seeking to recover the loan made, and the Trust Company says the Bank is estopped. Estopped in favor of whom? Certainly not in favor of the Trust Company. It has received the entire amount of the loan, and can show no injury to itself resulting from the violation, if it was a violation, of the Banking Law.

But it is said the Bank is estopped on grounds of public policy, that it was violating or evading the law, and that a court of equity will not allow it to show that it perpetrated a fraud upon the National Banking Act, but will require it to stand strictly upon the obligation which it took, in the form in which it was taken.

But all the authorities say that, although a loan to more than ten per cent. of the capital stock is directly made, and there is thereby a violation of the provision of the Banking Act, this does not preclude the Bank from recovering the whole amount loaned from the borrower.

21st Amer. & Eng. Ency. of Law, p. 382.

Union Mining Co. vs. Rocky Mt. Bank, 96 U. S. 640.

O'Hara vs. Bank, 77 Pa. 96.

Shoemaker vs. Mechanics' Bank, 31 Md. 396.

If this is so, it is difficult to understand why any stricter rule should be applied as against the Bank, where a scheme was adopted to evade or overcome the law, than is applied where there is a direct violation of the law. When the evidence objected to is in, it simply shows that, under the form which was adopted, there was a violation of the law, and if in the case of a direct violation there is no bar to a recovery, there is no reason why such a bar should be allowed where the violation was through a direct means. In both cases the borrower has received the money loaned, and in equity and good conscience should be made to pay it.

Upon this branch of the case therefore, the conclusion is reached that the transaction between the Bank and the Trust Company was a loan of money from the former to the latter, and that, such being the case, it is unnecessary to consider the objections set up to liability of the Trust Company upon the guaranty, if the claim of the Bank had to rest upon that alone.

Second. As another ground of exception to the allowance of the claim of the Bank, the doctrine of *ultra vires* is invoked, and the application of this doctrine to the purchase by a corporation of shares of its own stock has been very fully and ably discussed both in the oral arguments and the printed briefs.

The contention is that the transaction was clearly beyond the power of the Maryland Trust Company, and therefore void. It will be assumed upon this branch of the case that the term ultra vires is used to indicate acts, not necessarily illegal, as being against public policy or public morals, but acts which are merely beyond the powers conferred upon the corporation by the act of its creation. In its ap-

plication to this case it means that the transaction between the Bank and the Trust Company is void, because the Trust Company was without power to purchase shares of its own stock. It is admitted that the rule in England, with a few exceptions which need not be mentioned here, is that a corporation has no power, unless it is expressly granted, to purchase its own stock. The authorities show that, while the English rule has been followed in some of the States, the prevailing American rule is that a purchase by a corporation of its own stock in good faith, and without prejudice to creditors, and without fraud, is not ultra vires.

1 Clark and Marshall Private Corporations, Sec. 199.

It is well to get down to the precise question presented in this case upon this branch of the subject. It has already been found from the facts in evidence, that the transaction between the Bank and the Trust Company was a loan of money by the former to the latter. It is not contended that there was anything ultra vires in this. The Bank had the power to loan, and the Trust Company the power to borrow. But it is admitted that the Bank knew when the loan was made; that the money was to be applied by the Trust Company to the purchase of its own stock. The contention is that such purchase was ultra vires, and that, as the Bank knew the purpose to which the money loaned was to be applied, this knowledge made the Bank a party to the transaction, which was really ultra vires. Admitting, for the sake of the argument, that the purchase of the stock by the Trust Company was ultra vires, is this contention good? In other words, if a corporation borrows money, which it has the power to do, and applies it to a purpose which the court finds is ultra vires, and the lender knows that it is the purpose of the corporation thus to apply it, can the corporation set up the principle of ultra vires in a suit by the lender to recover the money?

The defense of ultra vires is generally regarded as an odious one, and it would be giving it a most unreasonable application to allow it to be set up under such circumstances. It would make the lender of money to a corporation, the corporation having full power to borrow, if such lender happened to be told the purpose for which the money was to be used, enquire whether that purpose was within the power of the corporation, and run the risk of a failure to recover the loan made, if it should turn out that the purpose was ultra vires. Such a burden the law surely should not impose upon him. It was, perhaps, the stress of meeting this view, which led the learned counsel, who made the concluding argument for the Trust Company, to earnestly contend that the transaction between the Bank and the Trust Company was not a loan, but that the Bank, by paying for the stock had actually become its owner, and that the agreement was that the Trust Company was to repurchase the stock from the Bank. The facts have already been found against this contention.

There is no lack of authority that the defense of ultra vires cannot be made to defeat the claim of the lender of money under such circumstances.

In Bradley vs. Ballard 55 Ill. 413, it is said: "A corporation cannot, under cover of this principle, (ultra vires), evade the payment of borrowed money, on the ground that, although it had power to borrow money, it expended the money borrowed in prosecuting a business which it was not authorized to prosecute, though the lender of the money knew that the corporation was transacting a business beyond its chartered powers, and that this money would be used in such business, provided the business itself was free from any intrinsic immorality or illegality."

In that case money was borrowed for which notes were given, and it was sought to enjoin the payment of these notes on the ground that the money was applied to mining operations in the State of Colorado; that the corporation under its charter had no power to prosecute a mining business in Colorado, and that the lender knew that the money was to be applied to this business. The court said: "The borrowing of the money was not in itself ultra vires, nor was the giving of the notes. The money was not borrowed to be used for any illegal or immoral purpose. The lenders have been guilty of no violation of law nor wrong of any kind."

In Wright vs. Hughes, 119 Ind., 324, a Life Insurance Company borrowed money from another Life Insurance Company and gave a mortgage upon

real estate to secure the loan. The money was applied by the borrowing company to the purchase and retiring of certain classes of policies which it had issued. Certain of the policy-holders asked to have this mortgage cancelled and declared void upon the ground that the company had no power to purchase and retire these policies; that the lending corporation knew that the money was to be applied to the purchase of the policies, and that "hence the loan from the transaction with the landing company were *ultra vires*." The court said: "After a corporation has received the fruits which grew out of the performance of an act, *ultra vires*, and the mischief has all been accomplished, it comes with an ill grace, then, to assert its want of power to do the act or make the contract, in order to escape the performance of an obligation it has assumed. The most that can be said in the present case is, that there was a *defect of power to engage in the transaction in which the money borrowed was used*.

"The power to borrow money was plenary, and subject to no restriction. In such a case, although the lender may know that it is the purpose of the borrower to use the money in any irregular way, yet if the contract between the lender and borrower is not in violation of law, or declared void by statute, the money may be recovered, unless the lender was in some way implicated in farthering the borrower's design, or accessory to the prohibited or illegal act."

Without quoting from any other authorities, it is sufficient to say that the same general doctrine is announced in—

Tracey vs. Talmage, 14 N. Y. 162.

Parrish vs. Wheeler, 22 N. Y. 502.

Thompson vs. Lambert, 44 Iowa 239.

The same doctrine is held in England.

In re. Contract Corporation, L. R., 8 Eq., 14.

The principle announced in these cases is particularly applicable here. The fact, that is admitted, is that the Bank knew that the money loaned was to be applied by the Trust Company to the purchase of its own stock. But it is conceded that such purchase is not necessarily ultra vires; that it becomes so when there is fraud, actual or constructive, and the purchase would "defraud or prejudice creditors or stockholders." When, therefore, the Bank lends money to the Trust Company, for which transaction there is plenary power in both corporations, and the Bank is informed that the money will be applied to the purchase by the Trust Company of its own stock, at the most, the Bank is informed that the use to be made of the money may or may not be an ultra vires act. Is the lender of money, under such circumstances, on pain of not being able to recover his loan, put upon inquiry as to all the internal affairs of the borrowing corporation, and forced to ascertain whether the use to be made of the money will operate to the prejudice of creditors or stockholders?

The exceptants have referred to but one case, where, apparently, a contrary doctrine to that announced in the cases above mentioned has been maintained, the case of Adams, &c., vs. Deyette et al., 8 S. Dakota, 119.

In this case there is some general language used to the effect that "actual notice on the part of one who loans money to a mercantile corporation, that the funds so loaned are to be used for the purchase of stock, in itself is sufficient to charge him with knowledge, that such an unauthorized act works an immediate fraud upon creditors, and is, therefore, against public policy and prohibited by the law of the land."

No authority is cited for this very broad statement, and when the facts of the case are examined, it clearly appears that the purchase of the stock in that case was made in *contemplation of insolvency*, and when insolvency occurred shortly thereafter, a judgment was confessed in favor of the lender, and the question was whether, by virtue of this confession of judgment, he was to have a preference over the other *creditors* of the corporation.

At the conclusion, the court says: "A careful research discloses no case, which goes to the extent of holding that a corporation, apparently in failing circumstances, can borrow money with which the purchase shares in itself, and give to the persons from whom the money is borrowed, a preference over all other creditors."

Three judges sat in the case, and there was a very vigorous dissent on the part of one of them, both from the general conclusion reached and

from the statement which we have quoted. At any rate, in view of the great weight of authority to the contrary, what has been quoted from this case cannot be accepted as a correct statement of the law.

Dealing still with the question of ultra vires simply, there is another principle, which operates to prevent its being a successful defense to the claims of the Bank in this case.

If the contract, which is claimed to be ultra vires, has been executed upon the one side, the other side cannot avail itself of this defense. The rule is thus stated in 29 Amer. & Eng. Ency., p. 50. "It is now well settled that a corporation cannot avail itself of the defense of ultra vires, when the contract has been in good faith performed by the other party, and the corporation has had the full benefit of the performance and of the contract. The same rule holds e converso; if the other party has had the benefit of the contract fully performed by the corporation, he will not be heard to object that the contract and performance were not within the legitimate powers of the corporation."

The notes show the great mass of authorities from all over the country sustaining the rule as thus announced. The authorities are not unanimous as to the remedy in such cases. Some courts, including the Supreme Court of the United States, holds that no performance on one side can give the contract any validity or be the foundation of any right of action upon it, but these courts, while denying a right of action upon the contract, permit property or money, parted with on the faith of the contract, to be recovered or compensation to be made for it. Other courts, and possibly the majority, allow the action to be brought directly upon the contract.

Upon this question Maryland must be placed in the latter class:

Heironimus vs. Stewart, 83 Md., 160.

Black vs. Bank, 96 Md., 429.

Bank vs. Katz, 57 Md., 128.

In the Katz case a savings bank had discounted a promissory note, and brought suit against the endorser. The court held that the savings bank had no power, under its charter, to discount the note, but that notwithstanding this, a suit could be maintained upon the note, the court saying "the rule is dif-

ferent in regard to executed contracts, these by the plainest rule of good faith should be permitted to stand." That was a suit by the corporation, which had executed its part of the contract, against the borrower, who had received the money. In this case the suit is by the lender, having executed its part of the contract by actually lending the money, against the corporation receiving the money. The rule applies equally in both cases. The counsel for the exceptants claim that the contract was not executed, but this claim is made upon the ground that "the contract sought to be enforced against the Trust Company in this case is the alleged agreement on the part of the Trust Company to take the stock off the hands of the Bank, i. e., to purchase the stock from the Bank by paying the notes which had been guaranteed in order to induce the Bank to buy the stock."

If this was really the contract, there would be no doubt that it was not executed, and the principle established in the Katz case would not be applicable. But, as has already been stated, the facts do not show that this was the agreement. The stock was purchased by Ramsay, acting as the agent of the Trust Company, and, as such agent, he deposited it with the Bank as collateral security for the money loaned by the Bank. So far as the Bank was concerned, the transaction was a loan of money to the Trust Company, and the Bank had performed its part of the contract by actually making the loan.

Upon both the grounds above set forth the conclusion is reached that the defense of ultra vires cannot be successfully made to the claim of the Bank.

Third. Finally, it is urged, that the purchase of its own stock by the Trust Company was for the purpose of stimulating its price upon the market, and thereby to deceive the public and especially the stockholders of the Guardian Trust Company, and that the purchase of the stock for such a purpose was not only ultra vires, but illegal as being against public policy and public morals.

The argument upon this branch of the case is presented in two forms.

The first is that the transaction between the Bank and the Trust Company was that the Bank was to pur-

chase the stock and become the owner of the shares purchased, and that the Trust Company was afterwards to repurchase the stock from the Bank, and that, as the purchase was for an illegal purpose, and the contract remains wholly executionary, it will not be enforced by the court on the principle of *in pari delicto potior est conditio defendentis*. As has been stated in the former part of this opinion, the court does not find this to have been the contract between the Bank and the Trust Company, and it is not necessary, therefore, to discuss further this view of the question.

But it is said that, even if the transaction was a loan of money by the Bank to the Trust Company, the Bank knew, not only that the money was to be applied to the purchase by the Trust Company of its own stock, but had either actual or constructive notice of the object of the Trust Company in thus purchasing its stock, that such object was illegal, and this being known to the Bank, rendered the contract of loan for such purpose illegal, and incapable of being enforced upon the *in pari delicto*, &c., doctrine.

The precise question presented, then, is this. Is a person, who loans money to another, knowing that it is to be, or will be, used by the latter for an illegal purpose, *in pari delicto* with the one so using it? The answer to this question, under the authorities, seems to depend upon the nature of the illegality.

The distinction is thus stated in Clark on Corp., 192: "Most courts hold that, when the direct object of a contract is innocent in itself, but the intention of one of the parties is unlawful, as where goods are bought or money borrowed to be used for an unlawful purpose, which is not *malam in se*, the fact that the other party knows of the unlawful purpose, does not render the agreement illegal, so as to prevent his maintaining an action thereon, *unless it is made part of the contract*, that the money or goods shall be used for such purpose, or unless he has done something in aid or furtherance of the unlawful design beyond merely entering into the contract."

In this State, in 10 G. & J., p. 8, this doctrine has been distinctly announced. In that case an action was brought to recover the price of a negro slave. The defense set up was that an Act of Assembly provided that when a slave was sold to be removed from the State, a bill of sale should be given by the vendor to the purchaser, in which the age, name, and distinguishing marks of the slave should be inserted, that the plaintiff knew that the slave was to be removed from the State, and did not give the bill of sale, as required by the act.

The Court of Appeals said: "The mere fact of knowledge alone of the illegal purpose in the mind of the purchaser, unaccompanied by any aid in furtherance of its execution, will interpose no bar to recovery of the purchase money. To deprive the seller of goods of his right to sue for the purchase money, it is not sufficient that he knows that the buyer will make an illegal use of them. To affect him, it must be shown that he was a sharer in the illegal transaction, or that he aided or assisted in its execution."

In Hanauer vs. Doane, 79 U. S. 342, where an action was brought on a promissory note, given for the purchase price of goods, with the knowledge on the part of the vendor that they were purchased for the Confederate States Government, it was held that recovery could not be had, the court saying, that "with whatever impunity a man may lend money, or sell goods to another, who, he knows, intends to devote them to a use that is only *malum prohibitum*, or of inferior criminality, he cannot do it without turpitude, when he knows, or has every reason to believe, that such money or goods are to be used for the perpetration of a heinous crime, and that they were procured for that purpose." In the same case the court says: "Where to draw the precise line between the cases in which the vendor's knowledge of the purchaser's intent to make an unlawful use of the goods will vitiate the contract, and those in which it will not say, may be difficult. Perhaps it cannot be done by exact definitions."

The Bank had the right to loan and the Trust Company to borrow the money. No illegality of any kind attached to this. Nor does the evidence show that it was any part of the contract of loan that the money should be used for the illegal purpose, or that the Bank did anything in furtherance of the unlawful design beyond making the loan.

Assuming that the Bank knew that the money was to be used for the purchase of the stock, and that the object, in purchasing the stock, was "to stimulate its price in the market," was this object, under the facts disclosed in the evidence, *malum in se*, so as to bring the Bank *in pari delicto* with the Trust Company.

While it is difficult, as the Supreme Court says, to draw the precise line between the cases in which the vendor's or the lender's knowledge of the intent of the purchaser or borrower to make an unlawful use of the goods or the money will vitiate the contract, and those in which it will not, it is at least necessary that the unlawful use shall involve moral turpitude; that it shall be either inherently criminal, or so manifestly intended to deceive and defraud, that the criminality or fraudulent purpose will be obvious to the vendor or lender when the knowledge comes to him. This much can fairly be gathered from the decisions in which there is some conflict, when the application of the principle is made to the facts of the particular case.

It would unnecessarily prolong this opinion to go into an elaborate discussion of the facts in this case. Indeed there is little dispute about them, as bearing upon this question. Negotiations had been entered into by Mr. Ramsay, representing the Maryland Trust Company, and the Executive Committee of the Guardian Trust Company for a merger of the two. These negotiations had culminated in an offer on the part of Ramsay, to give one share of the Maryland for two shares of the Guardian. This basis for the merger had been reached by the representatives of both companies upon a comparison of their assets respectively. When this became known, Hambleton & Co. came forward and publicly advised the stockholders of the Guardian not to accept the offer, and later themselves made a cash offer of $110 per share for a majority of Guardian stock. An apprehension, whether well founded or not, is immaterial, arose in the minds of the officers of the Maryland Trust Company, that Hambleton & Co. would attempt to defeat the merger scheme by offering for sale unusual amounts of the stock of the Maryland Company, thereby depressing its market price, with the possible result of causing the stockholders of the Guar-

dian Company to think it undesirable to accede to the plan of merger.

In this situation the officers of the Maryland Trust Company determined to maintain the price of its stock by purchasing from time to time, what was designated by one of the witnesses "as the loose stock," which should be offered.

The evidence does not show that there was any intention to unduly inflate the price. The plan of merger was based, not upon the market price of the stock of the two corporations, but upon their assets. The assets of the Maryland Company showed a value of about $250 a share, those of the Guardian Company of about $125 a share. The market price of each was considerably below this book value.

The stock of the Maryland Company had been selling, before any purchases were made by Ramsay on account of the Maryland Trust Company, at from $200 to $214 per share. The purchases made by him were at prices ranging from $210 to $215 per share. It is not seriously contended by the exceptants that there was any intention on the part of the officers of the Maryland Trust Company in making these purchases to do anything criminal or to defraud anyone. Indeed, in the brief filed on behalf of the Maryland Trust Company, and in the oral argument, it was conceded that "the objects and purposes of the parties may have been innocent or praiseworthy, but that the necessary effect was to mislead the public by making it believe that there was a market for the stock in excess of what there was."

This may be conceded, but the question is, was the transaction so bad in itself, so contrary to public honesty and public morals and public policy, that the court should say that the mere knowledge of it by the Bank, which loaned the money with which the stock was purchased, will preclude the Bank from recovering the money loaned?

Only one case has been referred to to sustain an affirmative answer to this question, the case of Scott vs. Brown, 2 Q. B. 1892, p. 724. In that case a company was being formed, and its promoter placed a certain amount of money in the hands of the broker of the company for the express purpose of buying shares of the company at a premium in order "to lead the public

to suppose that there were buyers of such shares at a premium on the stock exchange when in fact there were none but himself."

The broker pretended that he had bought the shares, but it afterwards appeared that he had simply transferred shares, which he himself held, to the promoter. The latter sued to recover the money that he had placed with the broker. The court held that the two had entered into an unlawful combination to deceive and defraud the public, that they could be held for a criminal conspiracy, and that such being the case, the maxim, *in pari delicto*, &c., applied, and that the court ought not to assist the plaintiff to recover the money.

If the thing to be done in that case was illegal and fraudulent, as the court found, there was no question that the very contract between the parties was to do that illegal and fraudulent thing, and hence the maxim necessarily applied. Here the contract between the Bank and the Trust Company, as has been found, was a loan of money, in itself entirely legal, and the right of the Bank to recover is denied upon the ground of its knowledge that the money was to be used for an unlawful purpose.

The illegality, if it exists in this case, is very different from that in the case relied upon. There the purpose was to deceive the public into supposing that there was a market value when there was none, and in further supposing that there was a premium upon the stock when there was none, to the knowledge of the parties. Here the stock of the Maryland Company had a market value, and the purchases were made at the market prices. The most that can be said is, that the effect of the purchases was to lead the public to believe that there was a market for the stock in excess of what there really was. The purchases were of stock *bona fide* offered for sale upon the public market. If the purchases had been made by the officers of the Trust Company, as individuals, instead of by the Trust Company itself, no question whatever could be raised about their entire legality.

The directors of the company could have formed a pool to buy the stock of the company, as the evidence shows certain directors of the Guardian Company formed a pool to purchase stock of that company, and there could be no question of the entire legality of such a combination.

The question, therefore seems, at the last, to come back to the doctrine of ultra vires, for it is difficult to perceive how an act, which is entirely legal, if done by an individual, or by a combination of individuals, can become an act in violation of public morals and public honesty if done by a corporation.

For an act to be *malum in se* it must be inherently wrong. It may be that, if the question was directly presented, the court would say that a corporation has no power to purchase its own stock, even if the purchases were made *bona fide*, when the purpose for which they were made was such as appears in this case, but such a decision would be based upon the ground that the purchase for such a purpose would be ultra vires.

At any rate the conclusion is reached that the purchases in this case, for the purpose undoubtedly of maintaining the market value of the stock, were not so *malam in se* as to preclude the Bank from recovering the money loaned, with which the purchases were made, upon the mere ground that the Bank had knowledge of such purpose.

This view renders it unnecessary to consider the questions, so fully discussed at the argument and in the briefs, as to whether the Bank had actual or, through Ramsay, its president, constructive knowledge of the purpose for which the purchases of the stock were made by the Trust Company.

Exceptions have been filed, on behalf of the exceptants, to certain parts of the evidence offered on behalf of the Bank, on the ground that the testimony excepted to is offered, for the purpose of varying the terms of, and contradicting, the written instruments, given to the Bank by the Trust Company, known as the guarantees.

In the previous part of this opinion, the court has held that it is competent for the Bank to show what was the real transaction between it and the Trust Company, and these exceptions, therefore, will be overruled.

As the counsel for the Bank have signified their assent to the postpone-

ment of the payment of the claim of the Bank until all other creditors of the Trust Company have been paid, I will sign an order or decree overruling the exceptions to the testimony, and directing the receiver in this case to pay the claim of the Mechanics' Bank out of any assets of the Trust Company in the hands of said receiver., after the payment in full of the claims of all other creditors of said Trust Company.